IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

MICHAEL PHILSON                                        PLAINTIFF

v.                      CASE NO. 06:09-CV-6053

ARKANSAS DEPARTMENT OF
HUMAN SERVICES                                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court are Defendant's Motion for Summary
Judgment and supporting documents (Docs. 35-37,52,58) and
Plaintiff's Response in Opposition and supporting documents (Docs.
46,47,55,56,59). Plaintiff Michael Philson is an African American
male who claims his termination of employment by Defendant Arkansas
Department of Human Services ("ADHS") constituted unlawful
discrimination in violation of Title VII of the Civil Rights Act.

As reflected herein, Defendant's Motion for Summary Judgment
is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE.**

### I. Background

Many of the relevant facts in this case are undisputed. To the
extent that Plaintiff, in responding to Defendant's Statement of
Facts, has relied on speculation, denials or allegations, without
a proper basis in fact or clear citation to facts already in the
record, the Court will view such facts as essentially undisputed.
*See* Fed. R. Civ. P. 56(e)(2)("When a motion for summary judgment is
properly made and supported, an opposing party may not rely merely
on allegations or denials in its own pleading; rather, its response

must. . . set out specific facts showing a genuine issue for trial.”). To the extent they are relevant, those facts not specifically controverted by Philson will be deemed to have been admitted pursuant to Local Rule 56.1. Where Philson has provided some basis in fact or in the record, however, the Court has made all inferences in his favor, as is appropriate when making a summary judgment determination. *Canada v. Union Elec. Co.,* 135 F.3d 1211, 1212-13 (8th Cir. 1998) (citing *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir. 1983).

Philson was employed by ADHS from June 20, 2003 until March 10, 2008. Philson worked at ADHS's Arkadelphia Human Development Center ("the Center") as an LPN - a licensed practical nurse. The Center is a full-time, 24-hour care facility that provides medical, residential, rehabilitation, and recreational services to individuals with developmental disabilities and/or mental illness. Center residents live in eight homes situated throughout the approximately 333 acre campus. Each home houses between eight and twenty residents, and the Center's group home houses approximately five residents. Each home has a living area, kitchen, dining room, bedrooms, bathroom, and indoor and outdoor recreation areas. The Center grounds also include classrooms and training areas, cafeteria, wellness center, and various other facilities. Center staff, visitors, volunteers, and some residents walk unaccompanied through campus. However, Philson argues that someone should know

the whereabouts of each resident at all times.

Most of the Center's residents take some type of medication. Since the institution of a computerized medication administration system called E-Mar in 2005, the residents' regularly-prescribed medications (with the exception of controlled substances), are kept in their homes in a locked medication cart or other locked area. Non-controlled substances are kept in bubble-pack containers that identify the medication, the resident to whom it belongs, and the date on which the medication is to be administered. According to Center policy, controlled substances are to be kept under double lock in the Center Administration Building's medication room. "Stock" medications are also kept in the Administration Building.

During his tenure at the Center, Philson received annual pay increases, including a merit increase on October 1, 2007, just months before his termination. In his annual performance evaluations, Philson received ratings of "meets or above standards." In May of 2006, Philson received a written "Thank You" from Center Superintendent Margo Green in recognition of his knowledge of the E-MAR system. Although Philson received a couple of "counseling" statements while at the Center, he had never been disciplined under ADHS's Minimum Conduct Standards prior to his termination.

On the morning of February 25, 2008, Philson started his shift

at approximately 4:30 a.m. He first set up[1] his medications to begin his rounds, including placing three Adderalls[2] into his hand-carried "med box." Med boxes do not have locks. All three Adderalls were to be administered to the same patient at three different times during Philson's shift. Two were to be administered during Philson's normal rounds at 7:00 a.m. and 1:00 p.m., while one was to be delivered at the individual time of 10:00 a.m.[3]

Philson then drove to his first assigned home (285 Oak) in a small van.[4] He administered "med passes"[5] to the residents of 285 and continued on to 286 and then 288 and conducted med passes in each of those two homes as well. Philson also checked the "treatment trays" in each of the three homes. He then drove some

---

[1] Each shift typically encompasses more than one time period in which medications have to be given to the residents, such that the nurses would make at least a couple of rounds in one shift. Setting up medications would entail putting medications in one of the cups of a "med box" (a plastic box with different sections containing small plastic cups with lids) with a card with the patient's name on it. Since only narcotics and "stock" medicine were kept in the Administration Building, only these medications would have to be "set up" before a nurse began rounds.

[2] Adderall is a prescription psychostimulant medication generally used to treat Attention Deficit Hyperactivity Disorder (ADHD) and narcolepsy. Because it has a relatively high potential for abuse and addiction, Adderall is a Schedule II Controlled Substance.

[3] According to the Medication Administration Guidelines, medications must be administered "one hour before or after the scheduled time of administration" unless a deviation is approved by a medical doctor or a registered nurse. (Docs. 35-1 at 44, 55 para. 18; Doc. 35-2 at para. 7).

[4] Staff often drove around the campus in vans or golf carts, which they referred to as "trucksters." The vehicles were normally kept unlocked.

[5] "Med passes" involve dispensing medication to the available residents of a house who are due to receive medicine during the time period of that round.

residents of 288 to a training area. Up to that point, Philson carried his med box, then containing two Adderalls and possibly some stock medication, with him from place to place. At some point, Philson delivered the second Adderall to the patient in 285 at his individual time. After dropping the residents off at the training area, Philson went to check the treatment trays in home 292, for which he had been assigned to check the treatment trays each month. While there, Philson received a call that one of the residents of 286, MC, was not feeling well. Philson went to the training area to check on MC and then went to 286 to consult the E-Mar system to determine what medication was prescribed for MC. While at the residence, Philson put some of the medicines for the next med pass for 286 in his med box. Philson admits he did this even though medications are normally given to the residents of 286 in the home, and though he had planned to give the medications to the residents in the home on that day. Philson explains that, while the residents were scheduled to be back in the home for the next med pass, he had been informed by the staff that some of the residents of 286 were going  to be running late and that, if they were not in the home for the med pass, he would have to find where they were and distribute the medications to them there.

Philson next drove back to the training area to tell MC that Philson would have to get the medicine MC needed from the nurse's station in the Administration Building and that he would bring it

back with him for the next med pass. At this point, Philson had left the med box, now containing one Adderall and medications from residence 286 unattended in the van. Philson contends that Center nurses normally did not carry med boxes inside the training areas because the residents can "grab and take stuff" and that if a nurse were to administer services to someone, a resident could easily pick up and take the med box. Philson then left the training area and drove to the Administration Building to get the medication for MC and order some new medication for treatment trays. Philson was inside for an estimated 30 to 40 minutes, during which time he again left the med box unattended in the unlocked van, which was parked just outside the Administration Building.

    At some point during this time, RN Charlene Miller searched the van, found the med box, and removed it from the van. When Philson left the Administration building to begin his next round, he did not immediately notice that the med box was missing. Philson did not need the med box to administer the med pass in the first residence, 285.[6] As a result, he did not notice that the med box was missing until arriving at 286. Philson, admittedly, did not report the med box missing at that point, thinking that he had perhaps locked it up in one of the locked carts in another residence. Because Philson had earlier put at least some of the

-----

[6] The one remaining Adderall in the med box was not to be administered to the resident of 285 until 1:00 p.m.

-6-

medications for the residents of 286 in the med box, he punched out medications from the blister packs for another date to administer to the residents of 286 at that time. Philson testified that it was routine practice to punch out medication from another date if the required medication was not there or if a pill was dropped on the floor.

When Philson arrived to residence 288, he received a phone call from the Center's Quality Control Coordinator, Phyllis Hankins, who asked him to come see her after completing his med pass. Ms. Hankins questioned Philson about the med box, which was then in her possession. Philson admitted to her that it was his med box, identified the medicines it contained (including the one Adderall and a liquid medication), and admitted that he had left it in his van. Philson disputed, however, that the med box had been found on the front seat of the van, claiming that it was concealed. Later that same day Hankins told Philson that he was being put on administrative leave.

After receiving information regarding the incident,[7] Center superintendent Margo Green concluded that Philson had violated ADHS and Center Policy by removing the medications from the home and leaving them (including a controlled substance and a liquid medication) unsecured in the van where they could have been

---

[7] Green and Mohammed did not conduct their own investigation into the incident, but rather relied on reports and written statements they received from others, mainly Phyllis Hankins.

-7-

accessed by Center residents or others. Green, together with Philson's Acting Service Area Director, Sharon Mohammed, determined that due to the gravity of Philson's infraction, Philson's employment should be terminated. Mohammed, an African American female, notified Plaintiff of his termination by letter on March 10, 2008.

While the original Notice of Disciplinary Action attached to Philson's termination letter indicates that Plaintiff failed to cooperate with the investigation, Philson disputes that contention. The State Employment Grievance Appeal Panel subsequently found insufficient evidence that Mr. Philson had failed to cooperate, but upeld his termination based upon his leaving his med box unsecured in the van. A revised termination letter was issued to Philson in January of 2009. This revised letter also dropped an insubordination claim that had been included in the original letter of termination. The claim was dropped prior to the ADHS fact finding hearing because the nurse who made the insubordination complaint, Charlene Miller,[8] moved out of state. The revised letter indicates that the decision to terminate Philson's employment was ultimately based on Philson's leaving the med box, which contained a controlled substance and liquid medication, unattended in an unlocked van and Philson's later failure to report the med box

---

[8] Miller lodged the insubordination complaint earlier on the same day that she searched the van Philson was using and reported finding his med box. Philson disputes that he had been insubordinate.

missing. The letter states that these actions violated Center Guidelines and policy as well as ADHS policy.

On March 17, 2008, Philson filed an internal grievance over his termination. The ADHS fact-finding hearing was held on July 29, 2008, and Philson's termination was upheld. Philson then appealed to the State Employee Grievance Appeal Panel ("SEGAP"), which also upheld Plaintiff's termination.

In July of 2008, Philson filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") alleging discrimination based on race, sex, and retaliation. In March of 2009, the EEOC issued a Dismissal and Notice of Rights. Philson then filed a Complaint, in July of 2009, against Arkadelphia Human Development Center and a number of individual defendants, claiming employment discrimination pursuant to Title VII of the Civil Rights Act. The claims against the individual defendants were later dismissed, and Philson was allowed to amend his Complaint to substitute Arkansas Department of Human Services as his actual employer and the correct defendant in this case. The complaint raised claims of discrimination, based on Philson's race and sex, that resulted in his termination. Philson seeks compensation for lost wages and reinstatement in his previous job.

## II. Standard of Review

Because Philson is a *pro se* litigant, this Court has construed his pleadings favorably. *Haines v. Kerner*, 404 U.S. 519

(1972)(holding *pro se* complaints "to less stringent standards than formal pleadings drafted by lawyers. . . "); *see also Whitson v. Stone County Jail*, 602 F.3d 920, 922 n.1 (8th Cir. 2010) (quoting *Fed. Express Corp. V. Holowecki*, 552 U.S. 389, 402 (2008) ("a pro se complaint must be liberally construed, and 'pro se litigants are held to a lesser pleading standard than other parties.'")), *Gerstner v. Sebig*, 2010 U.S. App. LEXIS 14604, 7-8 (8th Cir. 2010) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 ("Although [Plaintiff's] allegations are certainly sparse, we conclude, in light of the pro se nature of the complaint, they are sufficient as they provide 'factual enhancement' beyond mere 'labels and conclusions' or 'naked assertion[s].'")).

Read broadly, Philson's Complaint alleges his termination was the result of discrimination based on his race and sex in violation of the Title VII of the Civil Rights Act. While Philson has steadily maintained that he was discriminated against due to his race, he has also raised the issue of sex-based discrimination, including noting sex as a basis for discrimination on his intake questionnaire for the EEOC, which was attached to his Complaint. He has also consistently contrasted treatment of himself as a male employee with treatment of female employees, including making note of such differential treatment in the addendum to his Complaint. (*See e.g.*, Doc. 5-1 at 3)(relating alleged inconsistencies in workload assigned to Philson as opposed to female co-workers). As

-10-

the proceedings have advanced, Philson has continued to raise the issue of sex discrimination. In his Response in Opposition Philson again alleges he was assigned an unequal number of homes when working with white, female co-workers. Specifically, regarding his termination, Philson alleges he "was not treated the same as other co-workers who were white females and who committed the same policy violation as he did." (Doc. 47 at 5).

In both Defendant's Answer to Plaintiff's complaint and the Statement of Facts in Support of Defendant's Motion for Summary Judgment, ADHS acknowledged that Plaintiff filed a Charge of Discrimination with the EEOC alleging race and sex discrimination. (Doc. 26 at para. 2). Moreover, ADHS was given notice that the Court would be considering Philson's claim of sex discrimination and addressed the issue in their Reply to Plaintiff's Response in Opposition to the summary judgment motion. Philson was allowed to file a Response in order to address any new issues raised by ADHS in the Reply. Thus, the Court will consider whether summary judgment is appropriate for Philson's Title VII claim on the basis of both race discrimination and sex discrimination.

ADHS seeks summary judgment on Philson's discrimination claims. Philson argues that genuine issues of material fact exist as to whether his termination was motivated by a discriminatory impetus. In determining whether summary judgment is appropriate, the burden is placed on the moving party to establish both the

absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). The Court must review the facts in a light most favorable to the party opposing a motion for summary judgment and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.,* 135 F.3d 1211, 1212-13 (8th Cir. 1998) *(*citing *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir. 1983)*)*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in *Rule 56*, must set forth specific facts showing that there is a genuine issue for trial. *Ghane v. West,* 148 F.3d 979, 981 (8th Cir. 1998)(citing *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir. 1981)). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Furthermore, "[w]here the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."

-12-

*Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996)(quoting *Crain v. Bd. of Police Comm'rs,* 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

While *pro se* plaintiffs are given substantial leeway in the review of their pleadings, they still must comply with substantive and procedural law. *Am. Inmate Paralegal Ass'n v. Cline,* 859 F.2d 59, 61 (8th Cir. 1988). Even a pro se plaintiff must allege specific facts to survive dismissal and summary judgment; broad and conclusory allegations will warrant dismissal. *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *see also Fall v. Donley*, 2010 U.S. Dist. LEXIS 69619, 19 (W.D. Mo. 2010)(". . . *pro se* plaintiffs faced with summary judgment motions must present evidence establishing that they could prevail at trial, and may not rely on conclusory allegations and unsupported assertions alone")(citing *Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir. 1990)).

The Eighth Circuit Court of Appeals has often cautioned that summary judgment should seldom be granted in employment discrimination cases. *See e.g., Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir. 1998), *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994), *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991). "Because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the non-movant." *Peyton v.*

*Fred's Stores of Ark., Inc.,* 561 F.3d 900, 901 (8th Cir. 2009) (quoting *Crawford,* 37 F.3d at 1341). Nonetheless, employment discrimination cases are not exempt from summary judgment, *Christopher v. Adam's Mark Hotels,* 137 F.3d 1069, 1071 (8th Cir. 1998), and the fact remains that the ultimate burden of persuasion "that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000); *Harrison v. United Auto Grp.,* 492 F.3d 972, 975 (8th Cir. 2007) (citing *Bogren v. Minnesota,* 236 F.3d 399, 404 (8th Cir. 2000)).

## IV. Discussion

Philson has not provided direct evidence of discrimination.[9] Therefore, application of the *McDonnell Douglas* test is appropriate. *Fields v. Shelter Mutual Ins. Co.,* 520 F.3d 859, 863-64 (8th Cir. 2008). The *McDonnell Douglas* framework requires the plaintiff to first establish a prima facie case of discrimination, at which point the burden then shifts to the employer to articulate a legitimate,

---

[9] Direct evidence "includes evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Id.* (quotations omitted). Stray remarks, statements by nondecisionmakers, and statements by decisionmakers which are unrelated to the decisional process are not included as direct evidence. *Id.* (citing *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir. 1993)). The Court has determined that any evidence Philson has presented, outside of that considered under the *McDonnell Douglas* analysis, did not rise to the level of direct evidence such that it warranted separate consideration. The Court likewise declined to consider any evidence presented which was irrelevant to the case at hand.

nondiscriminatory reason for the allegedly discriminatory action. *Gordon v. Shafer Contr. Co.,* 469 F.3d 1191, 1196 (8th Cir. 2006), *Hammer v. Ashcroft,* 383 F.3d 722, 724 (8th Cir. 2004). If such a reason is established, the burden of production then shifts back to the plaintiff to show that the employer's proffered explanation was merely a pretext for unlawful discrimination. *Id.* The focus of inquiry at the summary judgment stage always remains on the ultimate question of law - whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the employee because of a protected characteristic. *Strate v. Midwest Bancentre, Inc.,* 398 F.3d 1011, 1018 (8th Cir. 2005).

To establish a prima facie case of discrimination, a plaintiff must prove that "(1) he or she is a member of a protected class; (2) he or she was meeting the legitimate expectations as to his or her duties; (3) he or she suffered an adverse employment action; and (4) 'circumstances give rise to an inference of discrimination as similarly situated employees, who were not members of the protected group, were treated differently.'" *Gilooly v. Missouri Dept. of Health and Senior Services*, 421 F.3d 734, 738-39 (8th. Cir. 2005) (quoting *Jacob-Mua v. Veneman*, 289 F.3d 517, 521-22 (8th Cir. 2002). For the purposes of this opinion, since the Court makes a determination at a later stage of the analysis, the Court assumes that Philson can establish a prima facie case of discrimination.

**A. Defendant's Burden to Show Legitimate Reason**

Once a plaintiff establishes a prima facie claim for discrimination, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action taken. The Court finds that ADHS has met this burden. The revised termination letter sent to Philson by the Center cites various violations of Center Guidelines and policies based on Philson's conduct on February 25, 2008. Specifically, the notice of disciplinary action attached to the letter lists the cause for termination as Philson's taking of medications from a residence earlier in the morning and leaving them, including a controlled substance, for a period of 38-45 minutes in an unlocked truckster outside the Administration Building accessible to any of the Center residents.

The defendant's burden at this stage is light, as it is one of production and not proof. *Britton v. City of Poplar Bluff,* 244 F.3d 994, 996-97 (8th Cir. 2001)(citing *Krenik v. County of Le Sueur,* 47 F.3d 953, 958 (8th Cir. 1995); *Fuller v. Alliant Energy Corporate Servs.,* 456 F. Supp. 2d 1044, 2006 U.S. Dist. LEXIS 75497, 35 (N.D. Iowa 2006) *(*"Because adverse employment actions almost always involve a very high degree of discretion, and most plaintiffs involved in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge.")*. It

-16-

is undisputed that Philson left his med box unattended in the van
he was using to deliver medication to the residences. Philson admits
leaving the med box, which contained a controlled substance and a
liquid medication, in the van for over half an hour. The Guidelines
cited in Philson's termination letter clearly outline mandatory
procedures that Philson failed to follow. The Center's "Guidelines
for Administering Medications" require that controlled substances
be "set up just prior to administration or kept under a double lock
at all times." (Doc. 35-1, Ex. 1 at para. 34). The same Guidelines
also provide that "[l]iquid medication should be poured out just
prior to its administration. Exposure to air can cause a change in
the efficacy of some medications." *Id*. Each nurse is required to be
aware of the Guidelines and, in fact, Philson had attended a
training session in which awareness of the Guidelines was
emphasized. Philson also attended a training session in which nurses
were instructed not to leave medications out where residents could
have access to them when the nurse is not physically present. The
Eighth Circuit has consistently held that "violating a company
policy is a legitimate, non-discriminatory rationale for terminating
an employee." *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 935 (8th
Cir. 2006).

**B. Plaintiff's Burden to Show Pretext**

Once a defendant establishes a legitimate, non-discriminatory
reason for an employee's termination, the burden then shifts back

to the plaintiff to show that the defendant's explanation for terminating his employment is pretextual. The plaintiff's burden at this stage is more onerous, "merg[ing] with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Dixon v. Pulaski County Special Sch. Dist.,* 578 F.3d 862, 868 (8th Cir. 2009)(citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). Philson must demonstrate that ADHS's proffered reason for terminating him was not the true reason, but rather was a pretext for discrimination. *Dixon,* 578 F.3d at 868 (citation omitted). He may do so "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Hammer,* 383 F.3d at 724 (quoting *Burdine,* 450 U.S. at 256). Philson attempts to take the direct route to show pretext, arguing that discriminatory reasons more likely motivated ADHS to terminate his employment. To succeed under this route, Philson "must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of [ADHS's] motive, even if that evidence does not directly contradict or disprove [ADHS's] articulated reasons for its actions." *Dixon,* 578 F.3d at 870 (citation and quotation omitted).

    The decision in this case turns on this issue of pretext. The tenor of Philson's filings appears to be an attempt to show that similarly situated employees were treated more favorably. "Instances

of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant aspects." *McNary v. Schreiber Foods, Inc.,* 535 F.3d 765, 770 (8th Cir. 2008)(quoting *Sherman v. Runyon,* 235 F.3d 406, 409 (8th Cir. 2000)(citation omitted)). The burden for Philson to show that he was "similarly situated to more leniently treated employees in 'all relevant respects'" is "a 'rigorous' standard at the pretext stage." *Anderson v. Durham D&M, L.L.C.,* 606 F.3d 513, 521 (8th Cir. 2009)(quoting *Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir. 2009)).

Philson takes both a general and a specific approach in arguing that he was similarly situated to other employees who were treated more favorably. Philson argues that he did nothing different on February 25, 2008 than on any other day during the duration of his employment with the Center. Furthermore, Philson argues that he did nothing different than any other nurse would have done on that day and had done in the past. Specifically, Philson claims that setting up medicines, including narcotics, for an entire shift was standard practice for nurses at the Center, as was carrying the medicines in a med box, none of which had locks. Philson claims that none of the vehicles on campus were kept locked (many of them were golf carts). Finally, Philson claims he followed standard procedure in punching out medications from a different date, when he no longer had the

-19-

medications with him for the present date. ADHS counters that Philson committed numerous violations of the ADHS Guidelines and that, given the gravity of those violations, Philson's conduct resulted in a terminable offense for which he was, in fact, terminated.

Following this general line of argument, the issue becomes whether the Center actually operated under the written guidelines (on which ADHS relies) or, rather, whether they operated under a different set of generally understood, and routinely followed set of operating procedures (on which Philson relies). If the nurses at the Center acted in accordance with some unwritten code of operating procedure to which management acquiesced, although encompassing conduct contradictory to ADHS guidelines, the reasons for Philson's termination (for violating what Philson alleges are routinely-violated policies) could be viewed as pretextual. Effectively, Philson would be showing that he was similarly situated to all the nurses at the Center who acted in accordance with regular operating procedure, but was treated differently in that his van was searched, he was reported, and he was later terminated. While judges are not to "sit as a super-personnel department" that examines the soundness of business policies, *Johnson v. Ready Mixed Concrete Co.,* 424 F.3d 806, 812 (8th Cir. 2005)(citation omitted), it is an obligation of the courts to ensure that those polices are not applied as a pretextual shield against otherwise unlawfully discriminatory

actions. An employer may develop even arbitrary, ridiculous and irrational rules as it sees fit, as long as "the employer [applies] its rules in an even-handed, non-discriminatory manner." *Smith v. Monsanto Chem. Co.,* 770 F.2d 719, 723 n.3 (8th Cir. 1985).

ADHS argues that this line of argument must fail, because neither Green nor Mohammed was ever made aware of any conduct similar to Philson's. ADHS also argues that, while Philson claims that he observed other nurses leaving unsecured medications in vehicles on Center grounds, he admittedly never reported anyone for doing so. Philson counters that he never reported anyone because it was common practice. While the Court recognizes the evidentiary predicament in which Philson finds himself in trying to prove that management was aware that it was common practice to act outside of the guidelines, the Court cannot make assumptions or draw conclusions where evidence is lacking. Philson has produced some evidence indicating that nurses may have left med boxes in trucksters on a fairly routine basis, including testimony from a fellow nurse and an affidavit signed by his former nurse supervisor. There is no indication, however, that either of these co-workers ever reported such a violation. Philson himself argues that Green and Mohammed were completely out of touch with the daily workings of the Center. If Green and Mohammed, the decision-makers in this case, were never made aware of widespread policy violations, discrimination against Philson cannot now be inferred simply because

-21-

Philson asserts those policy violations were continuously occurring and never reported. While Philson argues that his immediate supervisor should have been included in making any decisions regarding his employment, ADHS has argued that it was routine Center procedure for an incident of possible maltreatment to be handled by the Center Superintendent and the employee's Service Area Director - in this case Margo Green and Sharon Mohammed.

Philson has likewise been unable to establish, at a more specific level, that a similarly-situated individual at the Center was treated more favorably. Philson has provided documentation of several incidents at the Center in which nurses had committed "med errors" but were not terminated. The errors included giving patients the wrong amount of medications and giving medications to the wrong patient. ADHS argues that Philson is not similarly-situated to the individuals who committed these errors. First, Philson's conduct was intentional, and therefore, by definition, not an "error" or - as Philson characterized "med errors" - a "mistake." Philson argued in his most recent court filing that he never once admitted to intentionally leaving the med box in the van. While Philson may not have explicitly stated that his actions were intentional, his statements in earlier filings lead inevitably to that conclusion. Philson had stated, under oath, that he did nothing differently on the day in question than on any other day that he worked at the Center. He has frequently justified his actions, saying such conduct

-22-

was common practice. Philson left his med box in the van not once, but twice - once for over half an hour. He indicated that he often left his med box concealed in the van. Viewing the facts in a light most favorable to Philson, his actions in leaving the med box in the van, and in later failing to report it missing, can only be viewed as intentional.

Philson also argues that ADHS has made conflicting statements as to whether or not his actions could be characterized as a med error. While ADHS maintains that Philson acted intentionally, and therefore did not commit a med error, they also compare his actions to those of a former employee, nurse Lori Strickland, who was terminated for committing a "major med error." ADHS's characterization of Philson's intent level is significant in this case, as the employer's honest belief in their reasons for terminating an employee are central to the issues in an employment discrimination case. *See e.g. McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769-70 (8th Cir. 2008)(stating that whether the employer was actually correct in their surmise that an employee breached company policy was not the issue, but rather the burden was on the plaintiff to show pretext), *Scroggins v. Univ. of Minn.,* 221 F.3d 1042, 1045 (8th Cir. 2000) (finding that the relevant inquiry is whether the employer believed the employee was guilty of the conduct justifying discharge). In this case, ADHS has explicitly argued that Philson acted intentionally. Any comparison of Philson's actions

-23-

with those of Lori Strickland does not act to circumvent that belief. Strickland's termination was the result of conduct that included her intentionally setting up multiple medications at once which resulted in an error in giving the wrong medicine to a patient. Furthermore, ADHS never equates Philson's actions with those of Strickland, they merely claim that Strickland's situation would be the only one even "remotely related" to Philson's. No inherent contradiction exists in the two lines of argument, and Philson has not otherwise been able to cast doubt on ADHS's belief that he acted intentionally.

Furthermore, the standard for "similarly-situated" at this stage is rigorous. *Anderson v. Durham D&M, L.L.C.,* 606 F.3d 513, 521 (8th Cir. 2009)(quoting *Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir. 2009)). Philson's offense was leaving medications, including one Adderall (a controlled substance) and a liquid medication in an unlocked van for about 30-45 minutes in an area where residents were not currently present but into which they could have wandered.[10] Thus, the disciplinary actions included by Philson with his Response, while some may be for transgressions that, in the Court's view, are seemingly as grave as Philson's, do not include any evidence of conduct that is directly on point with Philson's. The Eighth Circuit has consistently held that the issue in an

---

[10] Although ADHS argues that patients were free to wander the campus, Philson argues that the residents' whereabouts were to be accounted for at all times.

employment discrimination is not whether an employer's decision appears to be erroneous, unreasonable, or harsh, but rather whether the plaintiff has presented evidence sufficient to show that he was discharged due to unlawful discrimination. *Johnson v. Ready Mixed Concrete Co.,* 424 F.3d 806, 812 (8th Cir. 2005). The documentation of the incidents fails to indicate that any of the nurses involved acted knowingly or intentionally, as did Philson, in committing a med error. Thus, the Court finds that Philson was not similarly situated in all relevant aspects to those employees.

At the most specific level, Philson references a particular situation in which a nurse at the Center, Sharon McKim,[11] a white female, had on one occasion left medication unattended in one of the Center residences. Like Philson, she also did not self-report leaving the medication unattended, but nevertheless was not terminated as a result of her conduct. ADHS argues, however, that Philson and McKim are not similarly situated because the two cases are clearly distinguishable. The Court agrees that Philson has failed to meet the rigorous standard in showing that he was similarly situated. Philson himself admitted in his Response that McKim "did not realize" that she had left the medications unattended. McKim had inadvertently left a med box, which did not contain any controlled substances, unattended in a patient's room

---

[11] This case was not included in the documentation of various med errors provided by Philson to the court as it apparently occurred after Philson was terminated. The case was, nevertheless, specifically addressed by both parties in their filings and was also discussed at the SEGAP proceeding.

after being distracted by a resident who had wandered into the room and refused to leave. McKim escorted the patient out of the room, leaving the med box on the top of a filing cabinet. An investigation into the matter revealed no evidence that McKim had left the box out intentionally. Thus, because McKim's actions were inadvertent as opposed to Philson's, which were intentional, Philson cannot be found to be similarly situated in all relevant aspects to McKim.

Finally, Philson refers to an incident at the Center in which a Center employee left medication out in a residence, but no one was ever disciplined. The Center acknowledges that the incident occurred, but argues that an investigation was conducted and it was never discovered who left the medication out. In any case, the situation would be similar to the one involving McKim, which has been discussed. However, in this case, Philson also argues that he was treated differently in that his case was, essentially, investigated more thoroughly than that of the similarly-situated, unknown nurse who left the medication out in the residence. ADHS argues that because the race and gender of the individual are unknown, Philson cannot use the situation as a comparator to his own. Philson argues that the culprit is known to the Center, but that the Center simply looked the other way. However, he has produced no evidence indicating that the Center did, in fact, discover who left the medication out in this particular instance. Philson offers only his speculation that it was probably a white

-26-

female. To the extent that Philson is challenging the investigation of his own case, "[e]ven if [Philson] could show that [the Center's] investigation was poorly conducted or that its decision was impetuous, that alone would not allow him to survive summary judgment." *Roeben v. BG Excelsior Ltd. P'ship,* 545 F.3d 639, 643 (8th Cir. 2008).

Philson's conduct can be differentiated from other med errors, including McKim's, in other respects as well. Philson left his med box accessible, not only to patients, but to staff and visitors. Philson also left the med box unattended on two separate occasions, with a controlled substance and a liquid medication inside, and subsequently failed to report the box missing. Finally, Philson set up the medications for one residence ahead of time, forcing him to later punch out medicines from a different date to give to the patients during their scheduled med pass. Philson has not produced evidence of any other nurse committing the same infractions for which he was terminated. Philson has, then, failed to create a genuine issue as to disparate treatment.

The Court emphasizes the often-reiterated position of the Eighth Circuit:

> "[A] number of plaintiffs present a sympathetic situation
> in which the employer's judgment in imposing discipline
> may appear poor or erroneous to outsiders. It is tempting
> to think that the role of the federal courts is to offer
> a remedy in that sort of case. Whether we might believe
> that [ADHS] was unduly harsh in its treatment of

> [Philson], however, is not a matter to be considered in
> deciding this [motion]. Our authority is to determine
> only whether there is a genuine issue for trial on the
> question whether [ADHS] discharged [Philson] because of
> his race [or gender]."

*McNary,* 535 F.3d at 770 (quoting *Ready Mixed Concrete Co.,* 424 F.3d

at 812 (quoting *Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 973

(8th Cir. 1994)). While the Eighth Circuit and its various District

Courts persevere in maintaining that summary judgment should rarely

be granted in employment discrimination cases, the practical

application of binding precedent necessarily results in granting

summary judgment for the employer in the overwhelming majority of

cases. Pretext is a high hurdle for any plaintiff to overcome, as

even the least-sophisticated of employers are unlikely to leave a

trail of blatant discrimination. The Court, in recognizing the

employee's predicament is, nevertheless, bound to decide in

accordance with those higher courts that have previously ruled on

these issues.

While there is reason to believe ADHS may have overreached in

terminating Philson, the Court must hold that Philson has failed to

show that there is a genuine issue of material fact as to whether

ADHS's proffered justification was pretext for an illegal

discriminatory motive based on his race or sex, and summary judgment

is, therefore, appropriate on both claims.

### IV. Conclusion

Based on the foregoing, the Court determines Defendant's Motion

for Summary Judgment is **GRANTED.** Plaintiff's claims are **DISMISSED WITH PREJUDICE** with the parties to bear their own costs and fees.

**It is so ordered this 10th day of November, 2010.**


                              _/s/ Robert T. Dawson_
                              Honorable Robert T. Dawson
                              United States District Judge